(No. 55370.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LARRY MACK, Appellant.

*Opinion filed November 30, 1984.—Rehearing denied February 1, 1985.*

108

CLARK, J., took no part.
SIMON, J., concurring in part and dissenting in part.

Steven Clark, Deputy Defender, and Patricia Unsinn and Martin Carlson, Assistant Appellate Defenders, of the Office of the State Appellate Defender, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, of Chicago, and Michael E. Shabat, Joan S. Cherry, and LuAnn Rodi, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE RYAN delivered the opinion of the court:

Alexander Peterson, Fletcher Turner, and the defendant in this case, Larry Mack, were indicted in the circuit court of Cook County on three counts of murder (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a)(1) through (3))

based on the shooting death of a security guard, Joseph Kolar, during a bank robbery. These three were also indicted for armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2) and armed violence (Ill. Rev. Stat. 1977, ch. 38, par. 33A—2) growing out of the same robbery; however, the armed-violence counts were not pursued by the State.

Peterson and Turner entered "blind" guilty pleas and were sentenced to terms in the penitentiary. After last minute plea negotiations proved fruitless, defendant Mack waived a jury trial as to guilt or innocence and was tried by the court. The defendant was convicted of three counts of murder and two counts of armed robbery. Thereafter a bifurcated sentencing hearing was held before a jury to determine if the defendant should receive a sentence of death. Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b) *et seq.*

After the first phase of the sentencing hearing, the jury found that the defendant was eligible for the death penalty because his conduct, personally murdering an individual during the course of a felony while of the age of 18 or over, satisfied one of the statutory aggravating factors which must be found before the death penalty can be imposed. (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(b)(6)(a) through (c).) During the second phase of the sentencing hearing, the jury heard evidence in aggravation and mitigation. The jury unanimously concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty. A sentence of death was entered for the murder conviction. The defendant was also sentenced to concurrent terms of 25 years of imprisonment on two counts of armed robbery. The defendant's death sentence was stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court (87 Ill. 2d R. 603).

Shortly before noon on November 23, 1979, the

defendant entered the West Pullman United Savings Bank in Chicago. John McGinty, a loan officer, was the first bank employee to notice the defendant. McGinty was seated at his desk talking to Joseph Kolar, the bank's security guard, who was standing in front of the desk. According to McGinty's testimony, which was partially corroborated by film from security cameras, the defendant walked up to Kolar and, without conversation, pulled a gun from under his coat and placed it inches from Kolar's collar. Kolar reacted by raising his arm trying to push the gun away. The defendant fired a shot through Kolar's right arm. He then put his hand on the back of Kolar's neck, placed the gun against Kolar's back, and walked or pushed him over to a position in front of a set of windows. While in front of the windows, the defendant forced Kolar to lie on his back on the floor.

The defendant then stood over Kolar, straddling the victim with his legs, fired the fatal shot into Kolar's chest, and took Kolar's gun from its holster. While the defendant was straddling Kolar, his two accomplices, Peterson and Fletcher, entered the bank and jumped over a partition to gain access to the teller's cages. While the accomplices gathered money and placed it into bags, the defendant patrolled the area in front of the teller's cages, carrying his gun as well as the gun he had taken from Kolar. The three robbers then ran out of the bank.

The trio's hasty exit from the bank was observed by Chicago policeman Richard Stake and two other officers who were driving near the bank in an unmarked car. According to Stake's testimony, the police drove their car around a corner in order to follow the robbers. After watching the robbers jump into a parked car, the police stopped their car about 20 feet in front of the robbers' car. The police left their car, drew their guns, ordered

the robbers to leave their car, and arrested them. The police recovered the bags of money, Kolar's gun, and the defendant's gun from the car.

On appeal, the defendant raises only issues regarding the sentencing hearing and the sentences which he received. As noted above, the assistant State's Attorneys and the defense counsel had a plea discussion prior to trial. On the morning the trial was to begin and while the jury venire was waiting, the defense counsel requested a plea-bargaining conference. The discussions between the assistant State's Attorneys and the defense counsel in the presence of the court were not on the record. It is not disputed that an initial offer was made by defense counsel to plead guilty in return for an agreed sentence of 50 years. This offer was flatly rejected by the prosecution. The defense counsel then expressed a willingness to plead guilty in exchange for a sentence of 75 years, and the trial court indicated a willingness to accept a plea on that condition. This offer was rejected by the assistant State's Attorneys after a conference with their superiors. Since the plea discussion was not of record, the prosecution and the defense counsel have different versions of the remainder of the plea discussion. It is not disputed, however, that following the rejection of the last offer, the defense counsel offered a guilty plea in exchange for a sentence of natural life imprisonment. The defense counsel contends that this position was acceptable to the State with the qualification that the deceased's family must be willing to go along with it. The State's version insists that the offer to plead guilty in exchange for a sentence of natural life imprisonment was conveyed to the assistant State's Attorneys' superiors, who neither accepted nor rejected it, but requested the assistants to contact the victim's family concerning the offer. That night the prosecutors spoke to members of the victim's family who stated that they were opposed

to anything other than the death penalty for the defendant. Thereafter, the assistant State's Attorneys were told by their superiors to reject the defendant's plea offer and to seek the death penalty. The next morning one of the assistant State's Attorneys reported that the State would not accept the plea offer. Defendant's counsel objected, maintaining that the State had agreed to accept the proposed plea bargain, and inferred that the State's rejection of the bargain was based *solely* on the wishes of the victim's family. Defense counsel asked the trial court to force the State to abide by the terms of the alleged agreement. The assistant State's Attorneys responded that they had never accepted the proposed bargain and maintained that the family's wishes were *a* factor in the decision to reject the offer but not the *sole* basis for the decision. The trial court denied the defendant's request to compel the State to accept the offer. Counsel for both sides and the trial judge then made statements for the record as to their respective understandings of the plea discussions. We will refer to these later.

The defendant argues that it is constitutionally impermissible for the State to give any degree of consideration to the victim's family's wishes in making the decision whether to accept a plea or whether to proceed to trial and to seek a death penalty hearing. Any degree of such consideration, defendant argues, is an abuse of the prosecutorial discretion approved in *People v. Lewis* (1981), 88 Ill. 2d 129, and *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, because the decision to seek the death penalty is not the decision of the prosecutor guided by the factors discussed in *Cousins*. Instead, the defendant contends, the decision is influenced by the whims of the family members and caprice and emotion are introduced into the sentencing process in violation of the eighth amendment as interpreted in *Gardner v.*

*Florida* (1977), 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197. The defendant's second argument on this point is somewhat related to the first, in that he also contends that such consultation and consideration make the imposition of the death penalty arbitrary and freakish by tying the defendant's fate to the victim's family's attitudes, which, presumably, will be diverse and not always consistent, depending upon the attitude of the family toward the death penalty. This perceived result is said to violate the constitutional strictures of *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909.

The defendant's argument founded on *Gardner* is based on language of that case which states that "any decision to *impose* the death sentence [must not appear to be based on] caprice or emotion." (Emphasis added.) (*Gardner v. Florida* (1977), 430 U.S. 349, 358, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204.) However, in *Gardner* the court was concerned with the possibility of caprice and emotion during the sentencing phase of the trial when the sentencing body actually makes the decision to impose the death penalty. Since we are here concerned with the prosecutor's decision whether to seek the death penalty, we do not find *Gardner* helpful. The defendant's argument must stand or fall under *Gregg* and its companion cases as interpreted by this court in *Cousins* and followed in *Lewis*.

The defendant relies on the language of Justice White in his concurrence in *Gregg* which states:

> "Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sen-

tence." (*Gregg v. Georgia* (1976), 428 U.S. 153, 225, 49 L. Ed. 2d 859, 903, 96 S. Ct. 2909, 2949.)

The defendant argues that the prosecutor's decision to seek the death penalty in this case was not directed by the factors referred to by Justice White in *Gregg* and by this court in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, but instead was guided by the insistence of the family of the deceased that the death penalty be sought.

This court's attention has not been directed to any decisions holding that it is unconstitutional for a prosecutor to consider the wishes of the victim's family in deciding whether to plea bargain. Our own research has not disclosed any such cases. In some States there are statutes which specifically allow or require a prosecutor to consider the wishes of the victim's family in conducting plea-bargaining discussions. (See Fla. Stat. Ann. sec. 921.143 (West Supp. 1983); Ind. Code Ann. secs. 35—35—3—1 through 35—35—3—6 (Burns Supp. 1984); Minn. Stat. Ann. sec. 611A.03 (West Supp. 1984).) Additionally, one commentator states that "[m]any, if not most, prosecutors' offices and trial courts take the attitudes of victims into account in plea bargaining and in sentencing." (Gifford, *Meaningful Reform of Plea Bargaining: The Control of Prosecutorial Discretion,* 1983 U. Ill. L. Rev. 37, 90 n.279.) American Bar Association Criminal Justice Standard 14—3.1(d) states, "The prosecuting attorney should make every effort to remain advised of the attitudes and sentiments of victims *** before reaching a plea agreement." That standard is quoted and echoed in the commentary to ABA Guidelines For Fair Treatment Of Victims and Witnesses In The Criminal Justice System (1983), Guideline 10, which states that "[v]ictims or their representatives in serious cases should have the opportunity to consult with the prosecutor prior to dismissal of the case or filing of a proposed plea negotiation with the court ***."

The defendant relies on the Supreme Court's decision in

*Linda R.S. v. Richard D.* (1973), 410 U.S. 614, 35 L. Ed. 2d 536, 93 S. Ct. 1146. There, the court held that a victim has no right to compel prosecution of an individual. We do not find this language controlling because a holding that a citizen lacks a common law right to compel prosecution does not require the conclusion that a victim's wishes are constitutionally required to be ignored by a prosecutor.

We conclude that a prosecutor is not barred from considering the wishes of the victim's family in determining whether to accept an offered plea bargain in a case where capital punishment is a possibility. We do not believe that Justice White's statements in *Gregg* should be viewed as an exhaustive and exclusive statement of the factors which may permissibly influence the exercise of prosecutorial discretion. A prosecutor's charging and plea-bargaining decisions necessarily involve the consideration of numerous factors which may vary from case to case.

In noncapital cases this court has acknowledged broad discretion as being vested in the prosecutor in determining whether or not to charge an individual with a criminal offense and the nature of the offense to be charged. In *People v. Rhodes* (1967), 38 Ill. 2d 389, 396, this court said:

"The State's Attorney is the representative of the People and has the responsibility of evaluating the evidence and other pertinent factors and determining what offense can properly and should properly be charged."

In *Oyler v. Boles* (1962), 368 U.S. 448, 7 L. Ed. 2d 446, 82 S. Ct. 501, the Supreme Court considered the defendant's argument that he was denied equal protection because he had been prosecuted as an habitual criminal, whereas other men subject to prosecution as habitual offenders were not. The court held that the conscious exercise of some selectivity in enforcement is not in itself a Federal constitutional violation, particularly since there had, in that case, been no showing that the selection was based on an unjustifiable standard such as race, religion, or other arbitrary classifi-

cation. We find that a similar discretion is vested in the State's Attorney in deciding whether he should accept a plea offer or whether he should seek the death penalty, provided the discretion is not exercised in an arbitrary or capricious manner and is properly channeled by accepted guidelines. We have noted in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, that the prosecutor's discretion is properly channeled under our statute. As a representative of the People, the prosecutor has the responsibility of evaluating all of the pertinent factors in making his decision whether or not to seek the death penalty. In doing so, he may properly consider the attitude of the victim's family as one of those factors.

Much of the defendant's argument is premised on the assumption that the offer of the defendant to plead guilty in exchange for a sentence of life imprisonment had been accepted by the prosecutors but was vetoed by the victim's family. Thus, defendant argues, the attitude of the victim's family was more than simply one of the many factors considered by the prosecutors. It was, defendant contends, the factor which caused the rejection of an accepted agreement. The record does not support this contention.

As noted above, no part of the plea negotiation was on the record. Following the breakdown in negotiations, the defense counsel, one of the prosecutors, and the judge each stated his recollection of what had transpired. The defense counsel's statement is to the effect that the bargain was unambiguously accepted by the prosecutors subject only to the approval of the victim's family. The prosecutor's statement was that there had been no acceptance of any offer to plead guilty on the part of the defendant. According to the trial court, defense counsel said that his client would be willing to plead guilty "to natural life." The trial court further stated "[a]t that point there were other discussions outside the presence of the court, telephone conversations apparently with the [assistant] State's Attorneys' superiors

and the State said that they would have to contact the victim's family before they could go ahead with any kind of negotiation, and the venire was sworn and the court came this morning feeling that the only impediment to the plea agreement was \*\*\* that the qualification that the family had [to] indicate[ ] a willingness to go along with it. That was made very definitely a condition precedent to any kind of an agreement by the State. The State advised the court first thing this morning that the family did not approve, and furthermore their superiors still were insisting upon looking at it as a death matter \*\*\*." Before proceeding to trial, defense counsel made a motion asking the court to specifically enforce the alleged plea bargain. Defendant's motion was denied. In doing so, the court stated that no plea agreement had been reached.

After trial, defendant, in arguing his motion for a new trial, maintained that the State had unambiguously accepted the defendant's plea-bargain offer. However, the trial court, in ruling on the motion, rejected this claim, stating:

"I do not think, considering all the attendant circumstances, that there was at any time an unconditional acceptance of the offer to plead by the State's Attorney's office, I reject that argument at this time."

Thus the trial court's holdings both in ruling on the motion to enforce the alleged plea bargain prior to trial, and on the defendant's motion for a new trial, were that the State's Attorney's office had never accepted the defendant's offer to plead guilty.

Defense counsel now argues that the language used by the court in setting forth his recollection of what transpired during the plea negotiations supports his position that there had been an acceptance of the offer by the prosecutor. Regardless of the construction which the defense counsel places upon this language, the fact remains that the trial judge who made that statement on two occasions

specifically held that the offer to plead guilty had not been accepted. In passing on the defendant's motion to enforce the alleged agreement, the judge stated that he thought that the record "with respect to the pre-trial negotiations is clear and I do not feel that there was any accord reached and no deprivation of rights of anyone." Reviewing the recitation of defense counsel, the prosecutor, and the court as to what had transpired during the plea negotiations, and the discussion between court and counsel at the time these statements were made for the record, as well as the statements made by the court at the time defendant made his motion to enforce the plea agreement, we cannot say that the holdings of the court in denying the motion to enforce the plea agreement and in denying the defendant's motion for a new trial constitute an abuse of judicial discretion. The holding that no accord had been reached is not against the manifest weight of the evidence.

Since there was no unambiguous agreement reached between defendant and the prosecution, we need not discuss defendant's contention that he was entitled to enforce the bargain he contends was agreed upon.

As noted earlier, the guilt of the defendant was decided by the court following a bench trial. The prosecutor then elected to have a penalty hearing to determine whether or not the death penalty should be imposed. The defendant elected to have this determination made by a jury. The defendant now contends that he is entitled to a new sentencing hearing because of errors committed in excusing jurors for cause under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The defendant contends that the five jurors who were excused under *Witherspoon* did not indicate in their response to questions by the court their total unwillingness to impose the death penalty in any case. Defendant claims that the answers of the excused jurors cannot be taken at face value because the preliminary remarks of the court to the panel of pro-

spective jurors did not properly inform the jurors as to the law governing their role in the sentencing process. They were informed that they would first be called upon to make a determination of whether or not the defendant was eligible for the death penalty, based on his age and finding of an aggravating factor. They were told that there would next be a hearing in aggravation and mitigation where they would be instructed on several statutory mitigating factors which, if found, might be sufficient to preclude the imposition of the death penalty. The defendant argues that when the excused jurors answered the *Witherspoon* questions, they were suffering from the misapprehension that the scope of the discretion they could exercise would be limited to considerations of only those mitigating circumstances spelled out by statute. We do not view that at this stage of the proceeding it was necessary for the trial court to accurately and completely instruct the jury on the law applicable to the case. A general knowledge of the law and a general knowledge of the nature of the proceedings were sufficient to enable them to answer the questions posed on *voir dire.* The answers of these jurors to the question by the court clearly indicate that they would not impose the death penalty in any situation regardless of the law applicable to the proceeding.

Considering these prospective jurors, we examine first the *voir dire* of prospective juror White.

"***

THE COURT: Now, are you making the statement that in—no matter what the case was, no matter what the evidence was, notwithstanding the strongest of proofs, are you telling me that in no case would you render the death penalty?

THE JUROR: In no case."

A similar in-chambers discussion was held with prospective juror Shay. That discussion was as follows:

"THE JUROR: I am against the death penalty. I don't

believe in it.
***

DEFENSE COUNSEL: May I ask—Mrs. Shay, are you saying that you are unequivocally opposed to the death penalty and that under no circumstances—and the reason I am articulating it this way, that's what the law says, that under no circumstances could you give the death penalty?

THE JUROR: Yes."

The next prospective juror challenged for cause was juror Gay. That discussion took the following course:

"THE JUROR: *** I don't think any human being can decide whether a man lives or dies. And that's the truth. I really don't think so.
***

THE COURT: *** Are you telling me that under no circumstances, irrespective of the facts, could you impose the death penalty?

THE JUROR: I could not, and I wouldn't."

The next person challenged for cause was prospective juror Gautier. Her *Witherspoon* questioning was:

"DEFENSE COUNSEL: And you are unalterably—as far as you are concerned, you are unalterably opposed to the imposition of the death penalty?

THE JUROR: Yes, yes, sir."

The defendant's final claim of error on this issue goes to the questioning of prospective Juror Segal. Mrs. Segal, being the mother-in-law of a rabbi, and having her youngest son studying to be a rabbi, asked to be heard in chambers. After she stated the general religious nature of her family, Mrs. Segal was asked:

"THE COURT: ***[Y]our conviction is absolute and under no circumstances because of your religious convictions could you in any case impose the death penalty?

THE JUROR: Right."

Even if we assume that all of the foregoing answers were made while the prospective jurors were under the

misapprehension that they would be limited to considering narrow statutory mitigating factors, it is clear that each prospective juror unambiguously expressed an inability to impose the death penalty under any set of facts. These statements are more than adequate to satisfy the Supreme Court's requirement that jurors may be excused for cause only when they make it "unmistakably clear *** that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them ***. (Emphasis in original.) *Witherspoon v. Illinois* (1968), 391 U.S. 510, 522 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21.

The defendant next raises an issue that has been raised in this court several times before. He contends that he was denied due process because the State used 12 of its peremptory challenges to excuse 12 prospective black jurors. This resulted in the defendant, who is black, having only one black juror on the sentencing panel.

This court, in *People v. Williams* (1983), 97 Ill. 2d 252, discussed at length this contention and the authority upon which it is based. We found that the defendant had demonstrated no constitutional violation by the use of peremptory challenges to exclude blacks from his jury. In *People v. Davis* (1983), 95 Ill. 2d 1, this court also rejected this argument and stated that only systematic and purposeful exclusion of blacks from juries raises constitutional questions. We further held that the defendant had the burden of producing some evidence establishing such a systematic exclusion. See also *People v. Gaines* (1981), 88 Ill. 2d 342, 358.

The defendant contends that the sheer number of cases in which the question of the prosecutor's abuse of the use of peremptory challenges is raised should convince this court that a remedy is required. The fact that the defendants have raised this issue in several cases does not establish that there has been a systematic and purposeful exclu-

sion of blacks from serving on juries in Cook County, where the defendant is a black. In this regard, although we do not consider this as authoritative, a recent investigative news story in the Chicago Tribune is of interest. In a story, the entire tone of which argued that a disproportionate number of peremptory challenges were used against blacks in cases where the defendants were black, one paragraph is of interest. The investigation covered 31 cases in which the defendants were black. The paragraph referred to stated:

> "Of the 372 people who served on the 31 juries, 90 were black, or 24 percent—nearly the same as census figures showing that 23 percent of Cook County residents 18 and older are black. The jury pool for the 31 trials was 29 percent black." (Chicago Tribune, Aug. 5, 1984, sec. 1, at 1, 14.)

This story involved a survey by investigative reporters of the Chicago Tribune of 31 criminal cases in which the defendants were black that were tried in the criminal court of Cook County during the month of July 1984.

Regardless of the many emotional arguments on this question that have been raised in this court and in our appellate court, there is just no evidence that blacks are systematically and purposefully excluded from serving on juries in Cook County where the defendants are black. In fact, the article in the Chicago Tribune referred to above indicates that the juries in Cook County trying black defendants, on an average, contain almost exactly the same percentage of blacks as does the population of Cook County. The defendant has demonstrated no need to jeopardize the vitality of a very essential tool of our adversary system, the peremptory challenge, by attaching restrictions and conditions to its use.

The defendant next contends that the *voir dire* conducted by the trial judge was inadequate to enable the defense to ascertain whether the jurors were racially biased

or prejudiced. In this case the defendant was black, as were his attorney and the witnesses who testified to mitigating circumstances. Trial counsel suggested that the trial judge on *voir dire* ask the prospective jurors whether they had any fixed attitudes toward interracial marriages; had substantial contacts with members of minority groups; perceived racial inequity in society; and if they read black-oriented publications. The court declined to ask these questions; however, in its opening statement to all the prospective jurors, the court told the jurors that "this happens to be a case where the defendant is black and the victim is white, but it is in no way a racial situation and any race prejudice, anything like that, has nothing to do with this case and if you have any attitudes reflecting that element, you must set them aside because I can assure they don't belong in this case and they should not become involved in this case." The trial court made similar statements to individual prospective jurors. These statements were often followed by questions such as, "The fact that the defendant is black and the victim is white, would that in any way affect your decision?"

The defendant relies on *Rosales-Lopez v. United States* (1981), 451 U.S. 182, 68 L. Ed. 2d 22, 101 S. Ct. 1629. We do not find this case supportive of the defendant's contention. In that case the Supreme Court stated that there are special circumstances under which the Constitution requires a question on racial prejudices. By way of illustrating these special circumstances the court cited *Ham v. South Carolina* (1973), 409 U.S. 524, 35 L. Ed. 2d 46, 93 S. Ct. 848, in which a black defendant was charged with a drug offense. His defense was that the law-enforcement officers had framed him in retaliation for his active and widely known participation in civil rights activities. The court noted that in *Ham* racial issues were " 'inextricably bound up with the conduct of the trial,' " and consequently there was a need under the circumstances to specifically in-

quire as to possible racial prejudices "in order to assure an impartial jury." (*Rosales-Lopez v. United States* (1981), 451 U.S. 182, 189, 68 L. Ed. 2d 22, 29, 101 S. Ct. 1629, 1635.) By way of contrast, the court in *Rosales-Lopez* cited *Ristaino v. Ross* (1976), 424 U.S. 589, 47 L. Ed. 2d 258, 96 S. Ct. 1017. The court noted that although *Ristaino* involved an alleged criminal confrontation between a black assailant and a white victim, "that fact pattern alone did not create a need of 'constitutional dimensions' to question the jury concerning racial prejudice." *Rosales-Lopez v. United States* (1981), 451 U.S. 182, 190, 68 L. Ed. 2d 22, 29, 101, S. Ct. 1629, 1635.

In our case there were no racial overtones, and as the Supreme Court noted in *Rosales-Lopez*, the fact that the defendant is black and the victim is white, or that the defendant's lawyer is black, as well as the defendant's witnesses, does not create a need of constitutional dimensions to question the jury concerning racial prejudice. The admonition that the court gave to the jury prior to *voir dire* and during *voir dire* on this subject was adequate. If the court had propounded the questions submitted by the defense counsel he might have injected racial overtones into the case where none were present before.

Defendant argues that it was plain error for the prosecutor to present evidence and make comments concerning the victim's family. Plain error is relied on by the defendant because the evidence and comments of the prosecutor now objected to were not objected to during the hearing.

At the first phase of the sentencing hearing, the victim's wife testified as a "life and death" witness. She testified that she and the victim had been married for 36 years, gave the names, ages and residences of their children, and stated that they had 10 grandchildren. No objection was made to this testimony. When the prosecutor asked Mrs. Kolar what kind of a man her husband was defense counsel objected and the court sustained the objection. At a

sidebar the prosecutor said he wanted to show how the death of her husband affected the witness' life. Defense counsel did not object but said that he would stipulate that it "made her sad, caused her a great deal of agony." The court then said that the prosecutor could ask the question. Again, no objection was made. In response to the question, the witness stated that the husband's death was like the loss of a hand. Also, the prosecutor made references to the victim's family during his argument. There were also no objections to these statements.

In light of this record we must hold that any error concerning references to the victim's family has been waived unless we can say that it constitutes plain error. These references to the victim's family were made during the first phase of the sentencing hearing. At that phase the jury had to determine beyond a reasonable doubt if one of the statutory aggravating factors was present and also if the defendant was 18 years of age or older. The aggravating factor in this case was that the defendant had committed murder in the course of an armed robbery. The evidence was overwhelming on that question. The criterion for the application of the plain-error rule in criminal cases is that the evidence be closely balanced. (*People v. Howell* (1975), 60 Ill. 2d 117, 121; *People v. Pickett* (1973), 54 Ill. 2d 280, 283.) The evidence on the question to be decided by the jury at the first phase of the sentencing hearing was not closely balanced. In fact there was no evidence contrary to the finding that the defendant committed the murder in the course of an armed robbery. There is no reason to apply the plain-error rule under these circumstances. The alleged errors not having been objected to were therefore waived.

At the second phase of the penalty hearing, the prosecutor again referred to the victim's family. Also, the victim's daughter testified, giving the names of her brothers and sisters, telling of their grief at her father's death and

describing the family as being a close family. She also identified a photograph of members of the family taken at a wedding. No objections were made to this evidence or to the remarks of counsel. Different rules of evidence govern this phase of a sentencing hearing from those applicable to the first phase. At this phase of the hearing, traditional rules of evidence do not apply. Both the State and the defendant are allowed considerable leeway in presenting relevant evidence. (*People v. Free* (1983), 94 Ill. 2d 378, 422.) In *Free* we held that the failure of the defendant to object to evidence concerning the victim's family at the second phase of the sentencing hearing constituted waiver. (*People v. Free* (1983), 94 Ill. 2d 378, 425.) Defendant has shown us no reason why we should depart from our holding in *Free* and apply the plain-error rule in this case.

Defendant complains that the State was permitted to mislead the jurors and to cause them to believe that imposing the death penalty was the only way to insure that the defendant would not be given an early release from a term in prison. This entire subject was opened up by the defense counsel. Any evidence or statements on this subject presented by the prosecution was clearly in response to evidence which the defendant had presented. During the aggravation and mitigation phase of the sentencing hearing, the defendant's wife testified on his behalf. Defense counsel concluded his direct examination of her by asking:

"DEFENSE COUNSEL: You understand that if by some chance he does not receive the death penalty that he would spend the rest of his life in the penitentiary?

WITNESS: Yes.

DEFENSE COUNSEL: There is a possibility of that?

WITNESS: Yes."

All of the complained-of questions propounded by the prosecutor and the prosecutor's argument concerning the possibility of parole came after these questions were asked by

the defense counsel. The trial court rejected defense objections to the prosecutor's interrogation along this line because the defense counsel had opened up the subject of parole and imprisonment. The defendant cannot complain about an inquiry concerning parole which he has invited. *People v. Garcia* (1983), 97 Ill. 2d 58, 88.

Defendant contends that the Illinois death penalty statute vesting the jury with unlimited discretion to determine nonstatutory aggravating factors is unconstitutional. This court has rejected this argument in *People v. Free* (1983), 94 Ill. 2d 378, 427, and in *People v. Davis* (1983), 95 Ill. 2d 1, 38. The defendant also raises two additional challenges to the constitutionality of our death penalty statute which have heretofore been passed on by this court. The defendant contends that our statute violates the due process clause and the eighth amendment of the Federal Constitution because it fails to contain any provisions which require the State to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of the death penalty. This contention was rejected in *People v. Free* (1983), 94 Ill. 2d 378, 421, and *People v. Brownell* (1980), 79 Ill. 2d 508. The defendant also argues that if the State had no burden to prove that no mitigating factors existed sufficient to preclude the imposition of the death penalty, it was error to permit the prosecutor to open and close final argument. This court decided this issue contrary to the defendant's contention in *People v. Williams* (1983), 97 Ill. 2d 252, 302.

The defendant next contends that he was denied effective assistance of counsel. The defendant did not testify at the first phase of the sentencing hearing. He did testify at the second phase of the sentencing hearing, which considered matters in aggravation and mitigation. It was his testimony that he did not shoot the victim intentionally either the first time when the victim was shot in the arm, or the second time when the fatal shot was fired

into the victim's chest. The defendant now argues that the testimony that the shootings were accidental should have been introduced at the first phase of the sentencing hearing. Defendant also now argues that defense counsel neglected to make use of valuable impeachment evidence which was consistent with the defendant's version that the shootings were accidental. We note that the alleged impeachment testimony consists of certain minor inconsistencies in the witnesses' accounts of how the victim was shot. We note that these alleged inconsistencies in the testimony of the prosecution's witnesses do not support in any significant way the defendant's theory that the shootings were accidental.

While the defendant's testimony about the first shot being accidental may not be wholly implausible, his testimony regarding the second and fatal shot is impossible to accept in view of the other evidence in the case. An eyewitness to the shooting, McGinty, described how the defendant straddled the security guard, who was lying on the floor, and shot him, and his testimony is corroborated to a degree by photographs taken by the bank's security cameras.

From the record it appears that defense counsel was quite aware of a possible accidental-shooting theory and attempted to develop it. During cross-examination of McGinty at the guilt/innocence trial before the court, counsel closely cross-examined him. The witness demonstrated how defendant stood and his position at the time the second shot was fired. The demonstration did not support the contention that the second shot was fired accidentally as the defendant was bending down to remove the victim's gun from its holster. Also, during the first phase of the sentencing hearing, defense counsel, in cross-examining the ballistics expert, attempted to establish that the gun used by the defendant was such that it might have easily fired, thereby leading to an accidental

shooting. This effort also proved fruitless because the witness testified that the pressure needed to fire the gun was within normal tolerances. In light of the inability to develop any support for the accidental-shooting theory, we cannot say that the defendant was prejudiced by his counsel's decision not to put the defendant on the stand to tell the story that he told in the second phase of the sentencing hearing.

After this case was taken under advisement, the United States Supreme Court announced its decision in *Strickland v. Washington* (1984), 466 U.S. ____, ____, 80 L. Ed. 2d 674, 104 S. Ct. 2052. In *Strickland,* the court held that the same standards apply for effective assistance of counsel in a capital punishment sentencing hearing that are applicable in a guilt/innocence trial, that is, "to ensure that the adversarial testing process works to produce a just result under the standards governing decision." (466 U.S. ____, ____, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) As announced in *Strickland,* the test for effective assistance of counsel has two prongs:

> "First, the defendant must show that counsel's performance was deficient [by] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (466 U.S. ____, ____, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.)

> "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. ***

> Judicial scrutiny of counsel's performance must be highly deferential. *** [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (466 U.S. ____, ____, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065.)

"When a defendant challenges a death sentence *** the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. ____, ____, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2069.

In developing the reasonable-probability test, the court stated that it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding, because "[v]irtually every act or omission of counsel would meet that test ***." (466 U.S. ____, ____, 80 L. Ed. 2d 674, 697, 104 S. Ct. 2052, 2067.) On the other hand, the "defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (466 U.S. ____, ____, 80 L. Ed. 2d 674, 697, 104 S. Ct. 2052, 2068.) The appropriate standard of prejudice, the court stated, should be somewhat lower because "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." (466 U.S. ____, ____, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) Thus the court settled on the reasonable-probability test and stated:

"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (466 U.S. ____, ____, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.)

The court further stated that "[a] reasonable probability is a probability sufficient to undermine confidence in the out-

come." 466 U.S. \_\_\_, \_\_\_, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.

On appeal the defendant points out several alleged deficiencies in trial counsel's performance and suggests certain things counsel should have done. We have referred to these above. Nowhere does the defendant contend that absent these alleged acts or omissions of trial counsel there is a reasonable probability that the result would have been different. The most that defendant asserts is that had the testimony that the defendant accidently shot the victim been presented to the jury at the first phase of the sentencing hearing, the jury "could have found that Mack had acted recklessly." As noted above, under the test announced in *Strickland*, it is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.

Under *Strickland*, in assessing trial counsel's performance, we must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable representation, and the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. This presumption has not been overcome in this case. Aside from defendant's presentation to this court, from an independent assessment of the overwhelming evidence which supports the State's position and from our assessment of defense counsel's performance, we cannot say that had defense counsel performed as defendant now argues he should have, there is a reasonable probability that the result would have been different. The defendant has not established his claim of ineffective assistance of counsel.

Defendant argues that he was deprived of a fair sentencing hearing by several comments of the prosecutor during closing argument and by a question asked of the defendant during cross-examination. It appears that all of these alleged errors, with the possible exceptions discussed later, were not objected to and were therefore waived. As

noted above, the evidence in this case was not closely balanced on the proof of the aggravating factor. The comments were not inflammatory. There is nothing in the facts of this case which requires us to apply the plain-error rule and consider these objections which are now presented for the first time on appeal.

The prosecutor argued that Mack had quit his last job because he did not like work. An objection was made to this argument by defense counsel, who stated, "There is no indication he doesn't like work." The court, though not specifically sustaining the objection, nonetheless, in response to the objection, instructed the jury to disregard any comments inconsistent with evidence. Defense counsel did not seek a more specific ruling on his objection. It is not unusual for a court to pass on an objection in this manner, particularly after a lengthy trial. In such a case a judge may not recall all the evidence, or he may not be able to locate reference to specific testimony in his trial notes so that he may rule specifically on such an objection on the spur of the moment. Instead of having the judge specifically say to the jury, by his ruling, that there was or was not evidence from which such an inference can be drawn, it would seem to be the better practice, when the judge's recollection is uncertain, to do as was done in this case. The jury, as the trier of the facts, is the proper forum to resolve whether there was evidence to support the inference. Since the defense counsel did not assist the judge further and did not seek a more specific ruling, the defendant cannot now be heard to complain.

During the hearing McGinty had testified that, when Mack directed him to sit on the floor, he said an act of contrition. The judge sustained an objection to this testimony. In closing argument the prosecutor stated:

"PROSECUTOR: Think of the terror John McGinty went through. Mr. Toole [defense counsel] may have jacked [*sic*] but he said an act of contrition—

THE COURT: Sustained. And the jury was instructed before to disregard that comment.

PROSECUTOR: My apologies, Judge.

THE COURT: Counsel, that was sustained during the course of the trial.

PROSECUTOR: I thought Mr. Goggin [another assistant State's Attorney] brought it out. I will proceed."

Although the above-quoted portion of the transcript states "Mr. Toole may have jacked," defendant in his brief states that defendant's counsel had objected to this testimony. In reading that statement in the context of the judge's comments, it appears that the transcript should have read "Mr. Toole may have objected." Mr. Toole was defendant's trial counsel.

It is apparent from the above-quoted portion of the argument that the prosecutor had apparently inadvertently misinterpreted a court ruling. The trial judge properly interrupted and cut short the remark and restated that the jury had been instructed to disregard that comment. The prosecutor apologized and proceeded without pursuing that discussion further. The manner in which the trial court handled this situation cleared any possible error. See *People v. Baptist* (1979), 76 Ill. 2d 19, 30.

The defendant contends that our death penalty statute and the rules of this court contain no provisions for meaningful appellate review of death sentences which can insure that a death sentence is not imposed capriciously or in a freakish manner. The defendant states that we held in *People v. Brownell* (1980), 79 Ill. 2d 508, that this court is in a position to insure sentencing consistency. Nonetheless, he contends, we have failed to make any meaningful comparison review in cases where we have affirmed the death penalty, citing *People v. Lewis* (1981), 88 Ill. 2d 129, and *People v. Gaines* (1981), 88 Ill. 2d 342. The defendant relies on *Harris v. Pulley* (9th Cir. 1982), 692 F.2d 1189, which had remanded a case to the California Supreme Court because

it had failed to undertake any proportionality review. *Harris*, however, was reversed by the United States Supreme Court. See *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871.

In *People v. Owens* (1984), 102 Ill. 2d 88, 115, this court considered our death penalty statute in light of the holding of the Supreme Court in *Pulley v. Harris* and stated:

"Inherent in our consideration of capital cases is a comparative review by us of appeals from death sentences which have previously come before this court and the disposition of those cases. (*People v. Free* (1983), 94 Ill. 2d 378, 427-30.) We consider this procedure adequate to insure a reasonable degree of uniformity. *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871."

Thus this court in *Owens* considered that our review of capital cases satisfied the constitutional uniformity requirements under the holding of *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871.

Of the 37 death penalty cases this court has reviewed as of the date this opinion was written, the death penalty has been upheld in only 17 of those cases. This close scrutiny of cases wherein the death penalty has been imposed belies defendant's contention that this court has not followed the assurance given in *People v. Brownell* that it is in a position to insure sentencing consistency.

The defendant contends that it was improper to convict him of two counts of armed robbery based on his single act of robbing the bank. The defendant was charged with and convicted of the armed robbery of both Kolar (the bank's security guard) and McGinty (the bank's loan officer) in that he took an amount of United States currency from the person and presence of these men. The defendant subdued Kolar by shooting him twice and while brandishing a weapon ordered McGinty to sit on the floor. The defendant's accomplices jumped over the partitions of the teller's cages and scooped up the money. The defendant was not

charged with taking the gun from Kolar, and the evidence shows that the currency the defendant was charged with taking was the currency of the bank taken from the teller's cages.

We find that the defendant should have been convicted of but one count of armed robbery. This case differs from *People v. Prim* (1972), 53 Ill. 2d 62, *People v. Butler* (1976), 64 Ill. 2d 485, and *People v. Thomas* (1977), 67 Ill. 2d 388. In those cases there were multiple takings from multiple victims. In those cases this court held that the defendants were properly convicted of more than one charge of armed robbery. This case also differs from *People v. Gaines* (1981), 88 Ill. 2d 342, where, although the threatened force was directed to all in the room, the taking of money was only from one victim. There, we held that the defendant could not be convicted of more than one count of armed robbery.

There are, however, appellate court cases with facts very similar to those in our case in which it was held that the defendant could be convicted of but one count of armed robbery. In *People v. Hunter* (1976), 42 Ill. App. 3d 947, the two defendants entered a restaurant at about 3 o'clock in the morning. The only other persons present were two women who were cleaning the restaurant prior to closing. One of the defendants threatened to kill the women if they did not open the cash register. One of the women complied with the demand, and the defendant took the restaurant's money from the cash register and fled. The defendants were charged with two counts of armed robbery—one count for the robbery of each woman. The State, in that case, argued that each victim was robbed of property under her control. The court noted that the property was stolen from the restaurant's cash register and not from the person of the women. The court cited *People v. Scott* (1974), 23 Ill. App. 3d 956, which held that under circumstances identical to those in *Hunter* there can be but

one conviction of armed robbery.

In *People v. Palmer* (1982), 111 Ill. App. 3d 800, two women were working in a 7-Eleven food store, which the defendant entered late at night. Both women were near the cash register. One was placing some items the defendant had purchased in a paper bag when the defendant pulled a gun and ordered the other woman to open the cash register, which she did, and gave the defendant the money. The defendant was convicted of two counts of armed robbery. The court, citing *People v. King* (1977), 66 Ill. 2d 551, held that it was improper to carve more than one offense out of a single physical act. The court found that the defendant had committed one act of armed robbery in taking the money from the cash register in the presence of both women by threatening the imminent use of force. The court stated that the property taken must have been in the presence or control of the victim.

We agree with the reasoning of the appellate court in the cases cited. As to the two charges of armed robbery we are now considering, there was but one armed robbery. McGinty held an official capacity with the bank. He was threatened with the imminent use of force, and the money was taken from his presence. The armed robbery as to McGinty will be affirmed. Since there was but one taking of money, the conviction of the armed robbery of Kolar will be vacated. The defendant was not charged with armed robbery based on the taking of Kolar's gun.

The defendant was convicted of three counts of murder. Only one person (Kolar) was killed, however. The defendant was charged (1) with intentionally and knowingly shooting and killing Kolar; (2) with shooting and killing Kolar with a gun knowing that such shooting with a gun created a strong probability of death or great bodily harm to Kolar, and (3) with shooting and killing Kolar while committing a forcible felony, armed robbery. There was evidence to support a conviction of all three charges, but

there was only one man murdered, and therefore there can be but one conviction. (*People v. Szabo* (1983), 94 Ill. 2d 327, 350.) When multiple convictions are had for offenses arising out of a single act, the rule is that the sentence is imposed on the most serious offense. (*People v. Donaldson* (1982), 91 Ill. 2d 164, 170; *People v. Duszkewycz* (1963), 27 Ill. 2d 257, 261.) In the latter case the court turned to the appraisal of the General Assembly to determine which was the more serious crime. In this case the penalty provided by the legislature gives us no help in making the determination as to which of the three murder charges is the most serious because the penalty for all three may be death. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b).) We consider, however, the intentional and knowing killing of Kolar to be the most serious crime of the three charged because an intentional and knowing killing involves a more culpable mental state than either shooting Kolar with a gun knowing the shooting created a strong probability of death or great bodily harm, or shooting and killing Kolar in the course of an armed robbery. Therefore, the conviction of murder for intentionally and knowingly shooting and killing Kolar will be affirmed. The other two murder convictions will be vacated.

For the reasons herein stated the defendant's conviction and sentence for the armed robbery of McGinty is affirmed. The conviction and sentence for the armed robbery of Kolar are vacated. The defendant's conviction and sentence for intentionally and knowingly shooting and killing Kolar are affirmed, and the other murder convictions are vacated.

The clerk of this court is directed to enter an order fixing Tuesday, March 12, 1985, as the date on which the sentence of death entered in the circuit court of Cook County is to be executed. A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections and to the wardens of the Illinois State peniten-

tiary where the defendant is confined and of the Illinois State penitentiary at Joliet.

*Affirmed in part and vacated in part.*

JUSTICE CLARK took no part in the consideration or decision of this case.

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the majority's judgment that the defendant's convictions of murder should be affirmed, but I dissent from the decision to impose the death penalty. For the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and *People v. Albanese* (1984), 104 Ill. 2d 504 (Simon, J., concurring in part and dissenting in part), I believe the Illinois death penalty statute is unconstitutional. Even if it were not, the conduct of the prosecutor makes the imposition of the death penalty improper because it violated the defendant's constitutional rights to be free from cruel and unusual punishment, to a trial by a fair and impartial jury, and to due process of law.

## I. A Plea Proposal Conditioned on the Consent of the Victim's Family is Incompatible with the Defendant's Right to Punishment Which is Not Cruel And Unusual

In substance the majority opinion holds that a victim's family may be permitted to veto a prosecutor's desire to enter into a plea bargain instead of requesting a death sentence. This, however, is unacceptable in light of the eighth amendment's command that punishments not be "cruel and unusual." (U.S. Const., amend. VIII.) The eighth

amendment requires that these decisions be based on rational factors such as the strength of the case and the likelihood that a jury will impose the penalty. (See *Gregg v. Georgia* (1976), 428 U.S. 153, 225, 49 L. Ed. 2d 859, 903, 96 S. Ct. 2909, 2949 (White, J., concurring); *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 540-43.) Decisions to ask for or impose the penalty which are significantly influenced by the desires of the victim's family are not included in any list of rational factors envisioned under a reasonable interpretation of the eighth amendment.

"[A]ny decision to impose the death sentence [must not appear to be based on] caprice or emotion." (*Gardner v. Florida* (1977), 430 U.S. 349, 358, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204.) The import of this language is clear. The *process* by which a State attempts to impose the death sentence must not be arbitrary, capricious or based primarily on the emotions of those most affected by the results of the crime. Instead, the process must be governed by reason and the sound judgment of the prosecutors. Anything less than this runs afoul of the eighth amendment.

The majority attempts to distinguish *Gardner* by emphasizing the use of the word "impose." They maintain that *Gardner* never reaches the question of whether "the prosecutor's decision whether to seek the death penalty" may be based solely on the desires of the victim's family. (105 Ill. 2d at 113.) Instead, the majority reasons, *Gregg* and *Cousins* establish the bounds of prosecutorial discretion when deciding whether to seek the death penalty, leaving the prosecutor free to base his decision on an almost unlimited set of factors. The majority concludes that a prosecutor may take into account the desires of the victim's family.

This reading of *Gardner, Gregg* and *Cousins* is unsound. *Gardner* speaks to the entire process of death sentencing. To place such a narrow meaning on the word "impose" is to invent a distinction where none exists. Instead,

the teachings of these cases clearly indicate that the *entire* death penalty process, as opposed to the different parts of the process (the decision to seek the death penalty as compared with the decision by the trier of fact to impose it), must be governed by reasoned decision making.

Even allowing for the majority's belief that the prosecutor can consider the desires of the victim's family, the facts of this case present an impermissible extreme. The defendant offered to plead guilty in exchange for a sentence of natural life imprisonment. The circuit court judge, on the record, noted that "the only impediment to the plea agreement [natural life] was *** the qualification that the family had [to] indicate[ ] a willingness to go along with it." (105 Ill. 2d at 117.) A fair reading of this record indicates that the wishes of the family were not one of several factors but rather that they were the controlling factor influencing the prosecutor's decision to seek the death penalty instead of continuing with the plea-bargaining negotiations. The trial judge's statement in denying the defendant's motion for a new trial, quoted in the majority opinion, merely states that no unconditional acceptance of an offer had been reached. It does not detract from his statement that the family's approval was "a condition precedent to any kind of an agreement by the State." This type of vengeance should not be allowed into a process which already freakishly imposes our State's cruelest form of punishment.

### II. The Use of Peremptory Challenges to Exclude Black People, as a Group, From Serving on the Jury Denied Defendant the Right to a Trial by Jury

The prosecutor's systematic exclusion of black people from the sentencing jury deprived the defendant of his right to a jury drawn from a fair cross-section of the com-

munity. For the reasons explained in my dissents in *People v. Payne* (1983), 99 Ill. 2d 135, 140 (Simon, J., dissenting), and *People v. Moore* (1984), 101 Ill. 2d 549 (Simon, J., dissenting from denial of leave to appeal), I believe that the State's use of peremptory challenges violates both the defendant's and prospective juror's constitutional rights.

The majority suggests that the Chicago Tribune study proves that the use of peremptory challenges has had no effect on the makeup of juries. This analysis fails to take account of all of the findings of the Tribune's month-long study. The Tribune notes:

"In jury selection for the 31 cases with black defendants, prosecutors exercised 213 peremptory challenges: 145 against blacks and 68 against whites, or 68 percent against blacks.

In comparing the large percentage of blacks excluded with the smaller percentage in the pool of potential jurors, David Draper, a statistics professor at the University of Chicago, said blacks were excluded at 'well over double the rate you would have expected if the peremptory challenges had been exercised in a color-blind fashion.' " (Chicago Tribune, Aug. 5, 1984, sec. 1, at 1, 14.)

Certainly in this case, the use of peremptory challenges by the State to exclude 12 black persons from the jury had an effect on the number of black persons who served on the jury. As a result, and as the majority points out, only one black person did serve on the jury.

The majority also suggests that the defendant has failed to establish systematic and purposeful exclusion by merely listing a large number of appeals in which such exclusion was charged. This, of course, places the defendant in an impossible position because the defendant cannot prove systematic exclusion in case after case unless appeals are reviewed as a group. However, this court persists in refusing to examine these cases in that context. Although the majority has never been willing to explore the facts of the

individual cases raising this issue, I am satisfied that these numerous appeals evidence the defendant's allegations.

An example of what has been happening is found in *People v. Cobb* (1983), 97 Ill. 2d 465. The record there shows that 39 peremptory challenges were used in three trials by the State, 36 of which were directed against qualified black jurors. After two juries failed to reach a verdict, the third jury (and the only all-white jury) convicted Cobb. Although we reversed the conviction on other grounds, this case provides dramatic proof of the realities of jury selection in the criminal courts of Cook County. This exclusion, based solely on race, denies the defendant his right to a jury of his peers and calls into question the integrity of our criminal justice system.

### III. Plain Error Resulting in a Denial of the Defendant's Right to Due Process Occurred When Certain Testimony of the Victim's Family Was Admitted

The defendant complains that the testimony of the victim's family deprived him of due process. Statements which compared the death of the victim to the loss of a hand and repeated descriptions of the victim's surviving children and grandchildren were all admitted without objection. For the reasons set forth in *People v. Bernette* (1964), 30 Ill. 2d 359, and my separate opinion in *People v. Free* (1983), 94 Ill. 2d 378, 434 (Simon, J., concurring in part and dissenting in part), I believe that admission of this testimony was plain error and deprived the defendant of his constitutional right of due process.