2016 IL App (3d) 120633

Opinion filed April 14, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-12-0633 |
| v. | ) ) | Circuit No. 09-CF-1536 |
| JASON ORASCO, | ) ) | Honorable Amy Bertani-Tomczak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Holdridge and Lytton concurred in the judgment and opinion.

**OPINION**

¶ 1    A Will County jury found defendant, Jason Orasco, guilty of three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2008)), one count of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)), one count of home invasion (720 ILCS 5/12-11(a)(2) (West 2008)), one count of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)), and one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2008)). The three first degree murder counts merged together, and the aggravated battery merged with the attempted first degree murder. The court sentenced defendant to consecutive sentences of 50 years' imprisonment for first degree murder and 25 years for attempted first degree murder, to be

served concurrently with sentences of 20 years for home invasion and 25 years for armed robbery.

¶ 2        Defendant appeals, arguing that his trial counsel was ineffective for failing to instruct the jury on the affirmative defense of compulsion. The State argues that counsel's decision was strategic and, alternatively, that it did not prejudice defendant's defense. In addition, the State claims that defendant's sentence is void because all of defendant's sentences must be served consecutively under section 5-8-4(d)(1) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(d)(1) (West 2008)). We affirm defendant's convictions and sentences.

¶ 3                                              FACTS

¶ 4        Defendant was indicted on three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2008)) (counts I, II, and III); one count of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)) (count IV); one count of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)) (count V); two counts of home invasion (720 ILCS 5/12-11(a)(2), (5) (West 2008)) (counts VI and VII); and one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2008)) (count VIII). The cause proceeded to a jury trial.

¶ 5        At trial, Ashley Hill testified that she, defendant, Matthew Edwards, and Mary Vetor were at Vetor's house on the night of July 6, 2009. Edwards commented that the group should rob somebody to earn some money. Defendant said he knew someone they could rob, a man named Josh Terdic, whom defendant had known for several years. Defendant explained that Terdic had money and drugs at an apartment he shared with his girlfriend in Channahon. Defendant said that Terdic worked construction and told the group his work schedule. The group decided to drive to Terdic's apartment building and wait outside until he left for work, when they would beat him up and take whatever money he was carrying.

2

¶ 6     According to Hill, after the group decided to rob Terdic, Vetor gave Edwards a .22-caliber pistol to use for "protection." Defendant saw Vetor give Edwards the gun. Defendant armed himself with a baseball bat. The four got in Vetor's truck and drove to Terdic's apartment building. Defendant gave Vetor directions along the way. Hill gave defendant and Edwards a prepaid cellular telephone to call for a ride after the robbery. Vetor dropped off defendant and Edwards to hide in a patch of trees down the street from Terdic's building. Vetor and Hill stayed in the truck and smoked marijuana.

¶ 7     While Vetor and Hill were smoking in the truck, police arrived and ticketed them for possession of marijuana, but did not take them into custody. After the officers finished their investigation and left the scene, Vetor and Hill drove off and waited for a telephone call from defendant and Edwards. The next morning, Vetor received a phone call, and she and Hill picked up defendant and Edwards from a friend's cabin in Channahon. Defendant appeared to be in shock.

¶ 8     The four drove to Vetor's house. The men had obtained money, which they split four ways among them. They had also taken a PlayStation 2 and a Nintendo Wii. The group watched the television news and cheered when it showed a story about the robbery. Hill did not know if defendant was cheering. Police arrived at Vetor's house that afternoon and arrested the four of them. Hill did not witness Edwards threaten defendant to participate in the robbery or witness defendant resist participating.

¶ 9     Lauren Vasilakis testified that on July 7, 2009, she was living with her boyfriend, Terdic. Early that morning she was awakened in their apartment by two men. One of them wore a mask; the other carried a gun. The masked man grabbed her from behind and put his arm around her neck. She could feel his heart "racing." She recognized the masked man's voice and knew he

3

was defendant, whom she had known for more than 10 years and who was a friend of Terdic's. The unmasked man, whom Vasilakis later identified as Edwards, left the bedroom to look for money and valuables. He gave defendant the gun to stand watch over Vasilakis and Terdic. When Edwards returned, defendant gave him back the gun.

¶ 10     Vasilakis heard Edwards threaten Terdic that if he did not give them more money, they would kill him. Edwards said that he had killed his own sister and had no remorse. When Terdic would not stop fidgeting, defendant pulled a bat out of his duffel bag and hit Terdic full force in the leg. Eventually, defendant and Edwards became convinced that they had recovered everything of value in the apartment. They discussed how to ensure that Terdic and Vasilakis did not call the police after they left. Vasilakis suggested that they could tie up her and Terdic. The men initially agreed, and Edwards gave the gun to defendant while Edwards tied them up.

¶ 11     Defendant then tried to choke Vasilakis into unconsciousness, but ended up only making her dizzy. Edwards and defendant conferred again, and Vasilakis heard defendant tell Edwards to "just do it."

¶ 12     Vasilakis felt someone kneel over Terdic and heard a gunshot. Then someone kneeled over her, and she could feel a gun pointing at her head through a pillow. She heard two clicks and then a ringing sound and felt wetness around her ear. She played dead until the two men left. After they left, Vasilakis untied herself and called 911 from a neighbor's apartment. Vasilakis was taken to the hospital and treated for a gunshot wound to the head. Doctors were unable to remove the bullet.

¶ 13     The State played for the jury a recorded interview with defendant conducted after his arrest. Throughout the interview, defendant states that Edwards was in charge and defendant participated because he was doing what he was told and had no choice but to participate.

4

According to defendant, the plan to rob Terdic came about after Edwards browsed through the contacts listed in defendant's cellular telephone. Upon seeing Terdic's name, Edwards decided that the group should rob Terdic.

¶ 14        Defendant explained that Vetor gave him and Edwards a gun with instructions to kill Terdic and Terdic's girlfriend. As defendant and Edwards waited in the trees near Terdic's building, they witnessed the police investigating Vetor and Hill in the truck. According to defendant, Edwards said he was going to kill the officers if they arrested Vetor. After the police left, Edwards and defendant approached the building to find a way into Terdic's apartment. Edwards found a way in, and defendant followed because he was scared.

¶ 15        Defendant stated that he and Edwards entered Terdic's bedroom and woke Terdic and Vasilakis. Edwards told defendant to choke Vasilakis so that she could not move. Defendant did as he was told. Terdic told the men that he had money hidden in the apartment, but Edwards had already found the money in another room. Edwards instructed Terdic and Vasilakis to lie face down and put a pillow over each of their heads. Edwards gave defendant a bat and told him to hit Terdic with it if Terdic kept squirming. Terdic moved, and defendant hit him in the leg with the bat.

¶ 16        Edwards left the room to find some rope and gave defendant the gun to stand guard. Edwards returned and tied up Terdic and Vasilakis. Edwards and defendant were contemplating what to do with their captives. Defendant told Edwards that they needed to kill them to keep them from telling police. According to defendant's statement, he did not really mean what he said and was only doing as he was told. Edwards then shot both Terdic and Vasilakis in the head. Defendant and Edwards left Terdic's house and travelled to a friend's cabin, where Edwards broke in. Edwards called Vetor and asked her to pick them up. When they split up the

5

money, defendant received approximately $70. Defendant stated that Edwards had forced him to commit the robbery by pointing the gun at him and threatening to kill him if he tried to run or told police. Defendant did not explain when or where Edwards had made that threat.

¶ 17　　During closing arguments, defense counsel argued that "[t]he facts don't hold up the proposition of accountability." According to counsel, defendant and Edwards were trying to determine what to do with their captives. At that point, defendant "heard a pop and turned, and then he saw [Edwards] shoot [Terdic]. This is far and above what [defendant] signed up for. There was no intent for all of this." Then counsel changed approach, arguing that defendant was scared and his participation in the crime was merely "self-preservation" because he was scared that Edwards would kill him. Counsel focused on the facts that Vasilakis felt defendant's heart racing and that defendant was in shock after the crime as evidence establishing that defendant was not a willing participant.

¶ 18　　The jury was instructed on accountability but not on the affirmative defense of compulsion. Defense counsel never tendered an instruction on compulsion. The jury returned guilty verdicts on all counts.

¶ 19　　At sentencing, the State informed the court of the sentencing ranges available on each count. The State asserted that counts I and IV (intentional murder and attempted murder) were required to run consecutively, but counts VII and VIII (home invasion and armed robbery) should run concurrently to each other and to counts I and IV. The court summarized, "the defense in the case is that you were terrified and there was nothing else you could do other than participate in this crime as far as it went." The court then pronounced defendant's sentences:

> "I agree with the State as far as the counts that Counts 2 and 3
> would merge into Count 1. There is the enhancement with the

6

firearm. I will sentence you to 50 years in the Illinois Department of Corrections on that matter and that is at 100 percent.

Count 4 is the aggravated battery with a firearm.[1] I am going to sentence you consecutive because the law requires that it be consecutive to 25 years in the Department of Corrections at 85 percent.

Count 7, the home invasion, 20 years at 85 percent, that will be concurrent.

And the armed robbery, 25 years concurrent. There is a three-year mandatory supervised release period. You will be given credit for all time served that you're entitled to, and I will enter judgment for any outstanding fines, costs, and fees."

¶ 20    Defendant appeals.

¶ 21                                    ANALYSIS

¶ 22    On appeal, defendant claims that trial counsel provided ineffective assistance by failing to tender a jury instruction on the affirmative defense of compulsion (720 ILCS 5/7-11 (West 2008)). The State responds that a compulsion defense was not supported by the evidence. In addition, the State claims that all of defendant's sentences must be served consecutively under the mandate of section 5-8-4(d)(1) of the Code. 730 ILCS 5/5-8-4(d)(1) (West 2008).

---

[1]The court apparently misspoke, as count IV charged attempted first degree murder. The court's written mittimus clarified that the court sentenced defendant to 25 years for attempted first degree murder, not aggravated battery. No sentence was imposed for aggravated battery as that count merged with the attempted murder count.

¶ 23                          A. Ineffective Assistance of Counsel

¶ 24          Criminal defendants enjoy a constitutional right to effective counsel. U.S. Const.,

amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668 (1984). To

succeed upon a claim that counsel provided ineffective assistance, a defendant must show that:

(1) counsel's performance fell below an objective standard of reasonableness, and (2) but for

counsel's poor performance, there is a reasonable probability that the result of the proceedings

would have been different. *Strickland*, 466 U.S. at 687. To establish deficient performance, a

defendant must overcome a strong presumption that counsel's actions were the product of sound

trial strategy. *People v. Manning*, 241 Ill. 2d 319, 342-43 (2011). However, "[w]here defense

counsel argues a theory of defense but then fails to offer an instruction on that theory of defense,

the failure cannot be called trial strategy and is evidence of ineffective assistance of counsel."

*People v. Serrano*, 286 Ill. App. 3d 485, 492 (1997).

¶ 25          In the present case, defendant claims that counsel was ineffective for failing to tender a

jury instruction on compulsion. The affirmative defense of compulsion is available when a

defendant has committed criminal acts under a reasonable belief that death or great bodily harm

would be inflicted upon him if he refused to commit the acts. 720 ILCS 5/7-11 (West 2008).

The defense is not available if the compulsion arises from the negligence or fault of the

defendant or if the defendant had any opportunity to withdraw from the criminal enterprise but

failed to do so. *People v. Humphries*, 257 Ill. App. 3d 1034, 1044 (1994).

¶ 26          A defendant need only present some evidence of an affirmative defense—such as

compulsion—in order to raise the defense and justify an instruction. *People v. Pegram*, 124 Ill.

2d 166, 173 (1988). After a defendant raises a defense, the burden shifts to the State to prove

beyond a reasonable doubt that defendant's conduct was not justified by the offense. *People v. Johns*, 387 Ill. App. 3d 8, 13 (2008).

¶ 27     In the present case, defense counsel argued that defendant was compelled to commit the charged offense, but counsel failed to tender a jury instruction on compulsion. That error deprived the jurors of the ability to acquit defendant if they found that he acted under the threat of death or great bodily harm. However, defendant cannot succeed upon his claim of ineffective assistance, because counsel's failure to tender an instruction did not prejudice defendant.

¶ 28     To establish prejudice in this case, defendant must show that had counsel tendered a compulsion jury instruction, there is a reasonable probability that the court would have allowed the instruction and the jury would have acquitted defendant based on compulsion.

¶ 29     The evidence presented at trial was insufficient to support a jury instruction on compulsion. First, the evidence did not establish that defendant committed the acts constituting any of his offenses under threat of great bodily harm or death. Defendant's repeated statements that he was just doing what he was told do not constitute compulsion, absent an impending threat of great bodily harm. *People v. Scherzer*, 179 Ill. App. 3d 624, 645 (1989). The only reference to a threat of any kind was defendant's statement that "He [Edwards] pretty much pointed the gun at me. And then pretty much told me if I snitched or even tried to run off that he would kill me." Defendant does not elaborate on when this alleged statement was made, nor was the statement confirmed by any other testimony. In fact, Vasilakis testified that defendant was the one encouraging Edwards to kill her and Terdic. Defendant himself said in his recorded statement that he encouraged Edwards to shoot Vasilakis and Terdic to prevent them from reporting the robbery.

9

¶ 30　　　　Second, any potential compulsion arose from the fault of defendant. See *Humphries*, 257 Ill. App. 3d at 1044. Hill testified that defendant suggested the idea to rob Terdic. Defendant then gave the group information about Terdic: that Terdic would have cash from his job in construction and that he lived in an apartment in Channahan with his girlfriend. Defendant then gave directions as Vetor drove the group to Terdic's apartment.

¶ 31　　　　Third, even assuming that defendant was acting under compulsion, he had opportunities to withdraw from the criminal enterprise but chose not to. See *Scherzer*, 179 Ill. App. 3d at 645-46. In particular, while inside Terdic's apartment, defendant on two separate occasions came into possession of the only firearm. Once in possession of the gun, defendant was no longer susceptible to any potential threats from Edwards. While defendant was the only one in the house armed with a handgun, he cannot credibly argue that he was acting out of fear of the unarmed Edwards. Defendant failed to withdraw from the criminal enterprise when he had the perfect opportunity to do so.

¶ 32　　　　Defendant did not receive ineffective assistance counsel. Had counsel tendered a jury instruction on compulsion, there is not a reasonable probability that the trial court would have given the instruction. Had the trial court given the instruction, there is not a reasonable probability that the jury would have acquitted.

¶ 33　　　　　　　　　　　　　　　　　B. Sentencing

¶ 34　　　　The State claims that the trial court's sentencing judgment does not comply with section 5-8-4(d)(1) of the Code, which would mandate that all of defendant's sentences be consecutive in nature. See 730 ILCS 5/5-8-4(d)(1) (West 2008). Citing *People v. Arna*, 168 Ill. 2d 107 (1995) (abrogated by *People v. Castleberry*, 2015 IL 116916), the State argued that a sentence that does not comply with statute is void and may, therefore, be corrected at any time. Defendant

10

conceded the issue.[2] We vacated defendant's sentences and remanded for resentencing. Defendant filed a petition for leave to appeal to the supreme court.

¶ 35    Subsequently, our supreme court issued a supervisory order, directing us to vacate our original opinion and reconsider our ruling in light of its decision in *Castleberry*, 2015 IL 116916. *People v. Orasco*, No. 118073 (Jan. 20, 2016). And so we do.

¶ 36    In *Castleberry*, our supreme court expressly abolished the void sentence rule. *Castleberry*, 2015 IL 116916, ¶ 1. In doing so, the court made clear that the issue of voidness is purely a jurisdictional question. *Id*. ¶ 15. In other words, a judgment is only void where the court entering that judgment has done so without jurisdiction. *Id*. Such is not the case where a trial court, vested with general jurisdiction by the Illinois Constitution (Ill. Const. 1970, art. VI, § 9), issues a sentence that does not comply with statute. See *Castleberry*, 2015 IL 116916, ¶ 18.

¶ 37    The *Castleberry* court further held that in the absence of the void sentence rule, the State may not directly attack the trial court's sentencing order. *Id*. ¶¶ 20-24. In that case, as in the case before us, the State challenged the defendant's sentence on the defendant's appeal. The court stated:

> "The State's argument in the appellate court that the 15-year enhancement should be applied to defendant's sentence was not brought to sustain the judgment of the circuit court. It was, instead, a new and different issue brought with a view to 'lessening the rights' of defendant. The State's argument was a *de facto* cross-appeal challenging defendant's sentence and, as such, was

—————————————

[2] Obviously, neither the argument nor the concession would have occurred had *Castleberry* been the law at the time of briefing.

11

impermissible. See, *e.g.*, *People v. Newlin*, 2014 IL App (5th) 120518, ¶ 31 ('What the State is essentially trying to do in the instant case is to piggyback an appeal on defendant's appeal. We can find no authority for such practice \*\*\*.'); [citations]." *Id.* ¶ 23. The court went on to suggest that the proper remedy for the State in seeking to correct an illegally low sentence is to seek leave to file a petition for a writ of *mandamus*. *Id.* ¶¶ 26-27.

¶ 38    *Castleberry* controls our disposition of the issue. Given the abolition of the void sentence rule, the State is barred from challenging defendant's sentence in this appeal. *Id.* ¶ 23.

¶ 39                                    CONCLUSION

¶ 40    For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 41    Affirmed.