# Illinois Official Reports

## Appellate Court

*People v. Jackson*, 2016 IL App (1st) 133823

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RODNEY CHANEY JACKSON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-3823 |
| Filed | October 27, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-18677; the Hon. Luciano Panici, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Ginger Leigh Odom, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and John J. Sviokla II, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury found defendant Rodney Chaney Jackson guilty of two counts of aggravated vehicular hijacking, two counts of attempted armed robbery, one count of unlawful use of a weapon by a felon, and one count of aggravated assault. The trial court sentenced him to 25 years in prison for each of the aggravated vehicular hijackings, 19 years in prison for one attempted armed robbery, 7 years in prison for the other attempted armed robbery, and 7 years in prison for unlawful use of a weapon by a felon, all to be served concurrently.

¶ 2    On appeal, defendant contends that (1) the trial court erred in declining his proposed jury instruction defining the defense of compulsion where the evidence at trial entitled him to the instruction and the court's decision was based on a mistake of fact, (2) this court should vacate one of his aggravated vehicular hijacking convictions based on the one-act, one-crime doctrine, (3) this court must vacate his sentences for aggravated vehicular hijacking and attempted armed robbery because they included firearm-sentencing enhancements that were not in effect at the time his offenses occurred, (4) the 15-year firearm sentencing enhancement does not apply to attempted armed robbery, and (5) his mittimus must be corrected to reflect the jury's verdicts.

¶ 3    We affirm defendant's convictions in part and vacate in part. Defendant was not entitled to an instruction on the defense of compulsion, where there was no evidence that the individual with whom defendant hijacked the car made an impending threat of violence toward defendant. Although defendant's co-offender testified that, while carrying a gun, he ordered defendant to get into the hijacked car, that evidence, even if believed by the jury, was insufficient to establish compulsion.

¶ 4    But we agree with defendant that one of his convictions for aggravated vehicular hijacking must be vacated under the one-act, one-crime doctrine. Although more than one individual was present during the hijacking, the presence of multiple victims does not change the fact that defendant committed only one criminal act—the taking of a single car—which cannot support multiple convictions.

¶ 5    We also agree, as does the State, with defendant's argument that he must be resentenced because the trial court applied an unconstitutional sentence enhancement to his aggravated vehicular hijacking sentence and his 19-year attempted armed robbery sentence.[1] We remand for resentencing and for the issuance of a corrected mittimus.

¶ 6                                    I. BACKGROUND
¶ 7    The State charged defendant with two counts of aggravated vehicular hijacking (counts 4 and 5), two counts of attempted armed robbery (counts 10 and 11), one count of unlawful use of a weapon by a felon (count 12), and one count of aggravated assault (count 16).

¶ 8    Prior to trial, defendant's original defense counsel filed multiple answers to discovery. In one, dated July 27, 2010, counsel attached a statement from codefendant Leonard Moore, who had pled guilty to the same aggravated vehicular hijacking and is not a party to this appeal. The statement said that, on the morning in question, defendant did not rob anyone, did not

---

[1]Defendant's seven-year sentence for attempted armed robbery is not at issue in this appeal.

encourage Moore to rob anyone, did not take the vehicle by force or threat of force, and did not possess any weapons.

¶ 9 Another answer to discovery, dated November 1, 2010, indicated that defendant might assert the affirmative defenses of necessity and compulsion. Counsel named Moore as a possible witness and cited Moore's previous statement. The State subsequently filed a motion to disqualify counsel for violating the witness-advocate rule because he was the only witness present for Moore's statement. The court granted the motion, finding it foreseeable that counsel could be called as a witness to Moore's statement.

¶ 10 Defendant retained new counsel, who filed an answer to discovery on November 28, 2012, asserting that defendant would "rely on the State's inability to prove guilt beyond a reasonable doubt, lack of intent, and lack of knowledge" as his defense. The answer listed Moore as a possible witness. On October 15, 2013, the first day of trial, counsel filed another answer to discovery, again asserting that defendant would "rely on the State's inability to prove guilt beyond a reasonable doubt, lack of intent, and lack of knowledge" and listing Moore as a possible witness. Counsel also filed a motion for a continuance based on Moore's absence, with Moore's statement appended to the motion, as well as a motion to "Adopt and Incorporate All Prior Pleadings Filed by Former Counsel." The court denied the motion for a continuance and did not rule on the motion to adopt prior counsel's pleadings.

¶ 11 At trial, the evidence showed that at approximately 4:30 a.m. on July 28, 2007, Jamie Fair and Aleah Cooper were with James Brown, Brandon Lewis, and Reginald Burrell in a White Castle parking lot in Dolton, Illinois. They all were either inside or standing outside Fair's vehicle, a black Toyota Solera, with the vehicle's front doors open. Fair stood outside the driver's side door, Brown sat in the driver's seat, Lewis sat in the passenger's seat with Cooper on his lap, and Burrell stood outside on the passenger's side. Brown's green Pontiac Bonneville was parked directly to the right of Fair's vehicle and was running.

¶ 12 Fair observed two men, defendant and Moore, approach. Moore asked for a cigarette lighter, and Brown responded they did not have one. Moore then approached Fair, pulled out a firearm and said, "You are not going nowhere. Give us what you got." Cooper, whose back was to the driver's seat, only heard someone say, "Give up your s***." She thought it was a joke until she turned around and saw Moore holding a firearm. Fair testified that Brown gave Moore his "dog tags" and $65.

¶ 13 Fair testified that defendant approached the passenger's side of the car. Cooper heard someone say, "Get out the car," and slowly began to get out. After Cooper got out, she saw defendant next to Burrell, "digging" his hands inside Burrell's pockets. Subsequently, both Cooper and Fair witnessed Burrell and defendant fight, though Fair did not recall if she told this to the police. Burrell managed to get away from defendant and ran out of Cooper's sight. As Burrell fled, Cooper slowly walked backward and eventually escaped. Cooper said that, at some point during the incident, defendant told her to empty her pockets and give him her "s***."

¶ 14 Fair also tried to escape, but defendant came around the vehicle and said, "No, Shorty, you ain't going nowhere." Defendant motioned toward his waist, which Fair understood as a gesture that he had a firearm. But Fair acknowledged that she never saw defendant with a gun.

¶ 15 Fair testified that defendant got into the driver's seat of the running Bonneville and Moore got into the passenger's seat. No one had given defendant or Moore permission to get into the car. As the men drove away into an adjacent parking lot, both Cooper and Fair said that they

saw gunshots being fired into the air from the vehicle, though neither saw defendant fire any shots. Cooper and Fair ran into the White Castle and alerted a security guard to what had happened. Shortly thereafter, the police arrived on the scene.

¶ 16 That morning, Dolton police Detective Major Coleman and his partner, Officer Joe McNeal, were in their unmarked car near the intersection of 148th Street and Dorchester Avenue when a green Pontiac Bonneville traveling at a "high rate of speed" nearly hit them. They activated their lights and sirens and pursued the Bonneville. After Coleman and McNeal chased the car for about five minutes, the Bonneville crashed into a parked car.

¶ 17 Coleman stopped just behind the Bonneville and got out. Coleman testified that defendant got out of the Bonneville from the driver's side and pointed a black handgun at him. Both Coleman and McNeal drew their guns and fired at defendant multiple times. Defendant fled, but Coleman eventually found him bleeding in a yard. Coleman did not find a gun on defendant. McNeal arrested Moore at the scene of the crash.

¶ 18 Later that day, both Fair and Cooper separately viewed photo arrays and identified defendant as one of the men they saw that morning.

¶ 19 At the conclusion of the State's case, the parties stipulated that defendant had previously been convicted of a felony in case No. 05 CR 14459.

¶ 20 Leonard Moore testified for defendant. Moore said that he was in prison for armed robbery and "vehicular carjacking." Moore said he went to the White Castle on July 28, 2007, with defendant and a man named "Do-Do." Moore admitted to robbing the group of people because he was high on "[a]lcohol, weed, marijuana, [and] ecstasy" and "pressed for money." Moore "took it upon [himself] to rob" the group of people using an unloaded gun. Moore identified the gun that Detective Coleman said defendant had as the gun he brought to the White Castle.

¶ 21 When Moore robbed the group, defendant stood 15 feet away, outside Do-Do's car. Moore testified that defendant did not know that Moore planned to rob anyone. He testified that defendant did not take anything from anyone, did not have a gun, did not encourage Moore to rob anyone, and did not have a fight with anyone.

¶ 22 After Moore robbed the group, he decided to get into the green Bonneville because Do-Do had left. Moore told defendant to "get in the car," but defendant was reluctant. Moore then told defendant to "get the f*** in the car."

¶ 23 Moore testified that defendant got into the driver's seat while Moore sat on the passenger side. Moore denied that they fired any gunshots as they drove away.

¶ 24 Moore said that, soon after they left the scene, the police began to follow them. Defendant was "nervous," and Moore told him to "keep it moving." During the drive, Moore held the firearm in his lap. Defendant never had the weapon, and Moore did not give it to him. Moore acknowledged that he never threatened defendant with the firearm but said that he "intimidated" defendant.

¶ 25 Eventually, defendant crashed the car, and Moore saw defendant hop out of the driver's side window. Moore testified that, when defendant left the car, there was "nothing in his hands." Moore "ducked down" in the car and tried to hide the gun, but the police arrested him. The gun remained beside him in the vehicle the entire time.

¶ 26 Moore said that he pled guilty to aggravated vehicular hijacking because he "sponsored it" without defendant's help. Moore said that defendant only drove the vehicle because he told him to. Moore also said he had known defendant for two years and previously intimidated him,

- 4 -

but defendant still "h[u]ng out" with Moore. Moore maintained he "made [the crimes] happen" and that defendant would not have driven the vehicle unless Moore had told him to because Moore "intimidate[d]" defendant.

¶ 27    Defendant elected not to testify.

¶ 28    In rebuttal, the State called Dolton police officer Curtis Ranson, Sr., who testified that, on the morning in question, he saw Officer McNeal putting Moore into handcuffs. Ranson also saw a gun about 20 to 25 feet behind the Bonneville on the ground.

¶ 29    At the jury instructions conference, defense counsel tendered multiple proposed instructions to the court, including an instruction defining the affirmative defense of compulsion. After the court asserted that there had been no prior notice of the defense, which the State confirmed, defense counsel said that he believed notice had been given by defendant's prior defense counsel. The court maintained it did not have any prior notice of the defense. Defense counsel responded that he had previously filed a motion to incorporate all prior pleadings from defendant's prior defense counsel. The court replied:

> "I am not denying that. I mean if I—had I seen it, I would give it. That is why—I'd anticipated that that was going to be the testimony yesterday, and I went through the file. I didn't find anything. So there has been no notice; so I am not giving it. Refused."

¶ 30    The jury found defendant guilty on all counts. Defendant filed an unsuccessful motion for a new trial, arguing, *inter alia*, that the trial court erred "in denying [his] proposed jury instructions," failing to give a jury instruction on the definition of immediate presence as it relates to aggravated vehicular hijacking, and failing to give the jury his proposed instruction on the definition of immediate presence.

¶ 31    The trial court sentenced defendant to 25 years in prison for each of the aggravated vehicular hijackings (counts 4 and 5), 19 years in prison for one attempted armed robbery (count 10), 7 years for the other attempted armed robbery (count 11), and 7 years for the unlawful use of a weapon by a felon (count 12), all to be served concurrently. The court did not mention a sentence for count 16, the aggravated assault conviction. However, a criminal disposition sheet in the record reflects that defendant received a one-year sentence for aggravated assault. The mittimus reflects defendant's 25-year sentences for aggravated vehicular hijacking and the 19-year sentence for attempted armed robbery but states that defendant received 5 years in prison for two convictions of unlawful use of a weapon by a felon. This appeal followed.

¶ 32                                    II. ANALYSIS
¶ 33                              A. Compulsion Instruction
¶ 34    Defendant first argues that the trial court erred in refusing to instruct the jury on the affirmative defense of compulsion where the court's decision was based on a factual error regarding notice of the defense and there was evidence that Moore compelled defendant to take the vehicle.

¶ 35    Initially, the State claims that defendant forfeited this argument because he failed to object to the trial court's refusal of his proffered instruction and his posttrial motion was not specific enough. We decline to reach the issue of defendant's forfeiture because, even if the issue was forfeited, our result would be the same. That is because defendant argues that the denial of the instruction was plain error, and when we conduct a plain-error analysis, the first question we

typically ask is whether any error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19. For the reasons we set out below, we find that the trial court did not err in denying the instruction, making a discussion of forfeiture unnecessary.

¶ 36    Defendant argues that the trial court's refusal to tender his instruction on compulsion was an error based on a mistaken belief that he had not given the State prior notice of his intent to raise compulsion as an affirmative defense. He asserts that his original attorney provided the requisite notice to the State in an amended answer to discovery filed on November 1, 2010. The State responds that the requisite notice was not given because defendant's new counsel filed two answers to discovery, never asserting his intention to raise compulsion as a defense. Rather, in those two answers, counsel said that he would rely on the State's inability to prove defendant guilty, his lack of knowledge, and his lack of intent.

¶ 37    Although the parties dispute the issue of notice, the underlying question remains whether defendant was entitled to a compulsion instruction at all. We examine that question first. See, *e.g.*, *People v. Houser*, 305 Ill. App. 3d 384, 389-90 (1999) (discussing whether defendant was entitled to have jury instructed on defense of necessity before discussing discovery-notice issue related to defense).

¶ 38    The threshold for giving an instruction is low. *People v. Washington*, 2012 IL 110283, ¶ 43. When "there is [any] evidence *** however slight" to support a defense, a defendant is entitled to an instruction on that theory. *Id.* In deciding whether the evidence supports an instruction, the court does not weigh the evidence presented at trial; it simply determines whether there is some evidence supporting the instruction. *People v. Jones*, 175 Ill. 2d 126, 132 (1997).

¶ 39    Although the trial court implied that, had there had been prior notice of the compulsion defense, it would have given the jury an instruction on compulsion, the court ultimately denied the instruction based on notice, not on the substantive evidentiary question of whether defendant would have been entitled to the instruction. Because the court never made a ruling on the substantive issue, we apply *de novo* review to that question. See *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 104 ("Where there is no ruling below for us to review, our legal consideration is made on a blank slate or *de novo*.").

¶ 40    Section 7-11(a) of the Criminal Code of 1961 (720 ILCS 5/7-11(a) (West 2006)), which defines the affirmative defense of compulsion, provides:

> "A person is not guilty of an offense *** by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."

To establish compulsion, the defendant must show that he was under "an impending, imminent threat of great bodily harm together with a demand that the person perform the specific criminal act for which he is eventually charged." *People v. Unger*, 66 Ill. 2d 333, 339 (1977); see *People v. Scherzer*, 179 Ill. App. 3d 624, 644 (1989) ("The threat must be of *imminent* death or great bodily harm." (Emphasis in original.)).

¶ 41    Here, the evidence presented at trial, specifically Moore's testimony, was insufficient to support an instruction on compulsion because the evidence did not establish that defendant entered the Bonneville under threat of great bodily harm or death. Moore testified that he ordered defendant to get into the car but did not say that he coupled his demand with an

imminent threat of great bodily harm or death if he failed to do so. Moore acknowledged that he did not threaten defendant. Nor did Moore testify that he pointed the firearm at defendant. Absent any contemporaneous threat of death or great bodily harm, defendant could not assert a compulsion defense. See, *e.g.*, *People v. Orasco*, 2016 IL App (3d) 120633-B, ¶ 29 (finding no evidence warranting compulsion instruction where, although defendant repeatedly stated that "he was just doing what he was told," there was no "impending threat of great bodily harm" despite co-offender "pretty much point[ing] the gun" at defendant and telling defendant that if he "tried to run off *** he would kill" defendant); *People v. Williams*, 97 Ill. App. 3d 394, 403 (1981) (no compulsion instruction warranted where, although defendant was ordered to drive getaway vehicle, there was no evidence defendant was threatened with "death or serious physical harm if she refused to cooperate or that defendant reasonably believed that death or harm would be inflicted if she refused").

¶ 42    Defendant argues that no explicit threat was necessary because Moore was armed with a firearm, implying that orders carried the threat of force. But this court has rejected the notion that mere possession of a firearm, absent a threat directed to the action in question, is sufficient evidence to warrant a compulsion instruction. See, *e.g.*, *Orasco*, 2016 IL App (3d) 120633-B, ¶ 29; *People v. Milton*, 182 Ill. App. 3d 1082, 1092-93 (1989) (no compulsion instruction warranted where defendant's acts were performed because of the codefendant's "mere possession of [a] gun, not because he actually threatened defendant *** with the gun"). Because Moore did not couple his demand that defendant get in the car with a threat of death or great bodily harm, defendant would not have been able to establish compulsion. Consequently, even if the trial court erred in denying defendant's instruction based on a lack of notice to the State, there would have been no error in denying the instruction.

¶ 43    Defendant maintains that no explicit threat was required because section 7-11(a) of the Code includes the "menace" of death or great bodily harm. 720 ILCS 5/7-11(a) (West 2006). And, citing a dictionary definition of "menace" as "a dangerous or possibly harmful person or thing" (Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/menace (last visited Sept. 12, 2016)), he argues that Moore presented the menace of death or great bodily harm by his possession of a firearm. But defendant has cited no case that has adopted this definition of "menace" and has not argued that our cases holding that someone's mere possession of a firearm is insufficient to prove compulsion are wrongly decided. See *Milton*, 182 Ill. App. 3d at 1092-93. We decline to depart from our precedent. We hold that defendant was not entitled to a compulsion instruction. The trial court did not err in denying that instruction, much less commit plain error.

¶ 44                          B. One-Act, One-Crime

¶ 45    Next, defendant contends that his two convictions for aggravated vehicular hijacking cannot simultaneously stand under the one-act, one-crime doctrine because they are based on his single act of taking one car. The State responds that defendant could be convicted of multiple counts of aggravated vehicular hijacking because, even though he took one car, his conduct affected multiple victims.

¶ 46    For several reasons, we conclude that defendant could not be convicted of two offenses for the act of stealing a single car, even if two people were present during the crime.

¶ 47    First, the plain language of the statute supports defendant's position. Aggravated vehicular hijacking occurs when a defendant commits vehicular hijacking and an aggravating factor—in

this case, defendant's use of a firearm—is present. 720 ILCS 5/18-4(a)(3) (West 2006). The vehicular hijacking statute, in turn, states:

> "A person commits vehicular hijacking when he or she *takes a motor vehicle from the person or the immediate presence of another* by the use of force or by threatening the imminent use of force." (Emphasis added.) 720 ILCS 5/18-3(a) (West 2006).

¶ 48 Thus, the act of vehicular hijacking occurs when the offender takes a vehicle from "another." The vehicle can be taken "from the person *** of another" or, as in this case, "from *** the immediate presence of another." *Id.*; see, *e.g.*, *In re Ricardo A.*, 356 Ill. App. 3d 980, 991 (2005), *overruled on other grounds by In re Samantha V.*, 234 Ill. 2d 359 (2009) (evidence sufficient to prove that car taken from immediate presence of victim where "evidence showed that [victim] was 5 to 10 feet away and even 1 foot away" from car).

¶ 49 The reference to the victim as "another" is significant because it is a defined term. The Criminal Code defines "[a]nother" as "a person *or persons* as defined in this Code other than the offender." (Emphasis added.) 720 ILCS 5/2-3 (West 2006). So "another" can mean more than one person. It follows that taking a vehicle from "the immediate presence of another" can include taking a vehicle from the immediate presence of multiple people. Contrary to the State's position, the fact that multiple victims were present during the hijacking of a single vehicle does not convert a single criminal act into multiple criminal acts; if only one vehicle is hijacked, only one crime is committed, regardless of the number of victims present during that act.

¶ 50 Our conclusion is supported by case law interpreting the armed robbery statute. Like aggravated vehicular hijacking, armed robbery occurs when a defendant "takes property *** from the person or presence of another." 720 ILCS 5/18-1, 18-2(a) (West 2006). The language of these statutes is so similar that vehicular hijacking could be fairly described, for all practical purposes, as robbery of a specific kind of property, a motor vehicle. Given the similarity in language, this court has previously analogized to the robbery statute when interpreting the vehicular hijacking statute. See *People v. Aguilar*, 286 Ill. App. 3d 493, 497 (1997) (looking to case law on robbery statute in interpreting vehicular hijacking statute because robbery statute "contains language virtually identical to that at issue in the vehicular hijacking statute").

¶ 51 In *People v. Mack*, 105 Ill. 2d 103, 134-35 (1984), *vacated on other grounds*, 479 U.S. 1074 (1987), the Illinois Supreme Court held that the defendant should have been convicted of only one count of armed robbery, where the evidence showed that the defendant shot a bank security guard and ordered the bank's loan officer to sit on the floor while his accomplices jumped behind the bank counter and took money. The defendant was charged with the armed robbery of both the guard and the loan officer, and both charges alleged that the property taken was the money from behind the counter. *Id.* The court distinguished its precedent involving "multiple takings from multiple victims" (*id.* at 135) and adopted the rationale of several appellate court cases, all of which held that only one conviction for armed robbery may stand when a defendant took money from a cash register in an establishment occupied by more than one person. *Id.* at 135-36 (citing *People v. Palmer*, 111 Ill. App. 3d 800 (1982), *People v. Hunter*, 42 Ill. App. 3d 947 (1976), and *People v. Scott*, 23 Ill. App. 3d 956 (1974)). Because there "was but one taking of money," the court held that only one conviction of armed robbery could stand. *Id.* at 136.

¶ 52 Consistent with *Mack*, this court has held that "multiple armed robbery convictions cannot lie when there is a single taking of property, even when multiple individuals are present and

threatened." *People v. Scott*, 2015 IL App (1st) 133180, ¶ 16; see also *People v. Moore*, 214 Ill. App. 3d 938, 944-45 (1991) (holding robberies of two business establishments, which involved two complaining witnesses each, sufficient to support only two armed robbery convictions); *Hunter*, 42 Ill. App. 3d at 951-52 (defendant could not be convicted of multiple armed robberies where defendant robbed cash register in presence of two people and did not take additional property from either person).

¶ 53    In light of the similarities between the armed robbery statute and the aggravated vehicular hijacking statute, it would be incongruous to hold that, under one statute, a defendant who commits one taking in the presence of multiple victims may only be convicted of one offense, but under the other statute, a defendant may be convicted of as many offenses as there are victims. The statutes are essentially the same, differing only in the type of property taken by the defendant.[2]

¶ 54    Notably, in the same public act that created the offense of vehicular hijacking, the legislature also "amended the robbery statute to exclude motor vehicles covered by vehicular hijacking." *People v. McGee*, 326 Ill. App. 3d 165, 169 (2001) (citing Pub. Act 88-351, § 5 (eff. Aug. 13, 1993) (adding 720 ILCS 5/18-3, 18-4)). And at the time of passage of the vehicular-hijacking legislation, *Mack* had already been decided. Because the legislature borrowed nearly verbatim the language of the robbery statute, which our supreme court had already interpreted in *Mack*, for the vehicular hijacking statute, we presume that it intended to incorporate the supreme court's interpretation of that language. See *People v. Coleman*, 227 Ill. 2d 426, 438 (2008) ("[W]hen a court interprets a statute and the legislature does not amend it ***, we presume that the legislature has acquiesced in the court's understanding of legislative intent.").

¶ 55    In this case, the evidence showed that defendant took only one car from the immediate presence of multiple people. Under the plain language of the aggravated vehicular hijacking statute and the supreme court's reasoning in *Mack*, only one of defendant's convictions for aggravated vehicular hijacking may stand.

¶ 56    We respectfully disagree with another decision from this court that reached the opposite conclusion. As the State notes, in *People v. Pryor*, 372 Ill. App. 3d 422 (2007), this court held that a defendant may be convicted of multiple counts of aggravated vehicular hijacking when more than one victim is involved, even if the defendant takes only one car. First of all, we cannot square *Pryor* with the supreme court's decision in *Mack*. Second, we do not read the relevant statutory language the same as the court did in *Pryor*.

¶ 57    In *Pryor*, the defendant was convicted of aggravated vehicular hijacking and vehicular hijacking based on the same single act of taking one vehicle from two people. *Id.* at 425, 429. The court focused on the same relevant language as do we—that vehicular hijacking is the taking of a motor vehicle " 'from *the person or immediate presence of another*' " by the use or threat of force. (Emphasis in original.) *Id.* at 435 (quoting 720 ILCS 5/18-3(a) (West 2002)). But the court reached a markedly different conclusion.

---

[2]The only other difference between the robbery and vehicular hijacking statutes is that the latter statute requires that the taking occur within the "immediate presence" of the victim, not merely within the "presence" of the victim, a distinction that is not relevant to our discussion. Compare 720 ILCS 5/18-3 (West 2006), with 720 ILCS 5/18-1 (West 2006); see *McGee*, 326 Ill. App. 3d at 170 (noting this difference between two statutes).

¶ 58    The court in *Pryor* recognized (as do we) that the word "another" could mean more than one victim (*id.*) and even went so far as to suggest that the defendant would be correct that only one act of hijacking was committed "if the vehicular hijacking statute were phrased as being committed against " 'one or more persons ***.' " *Id.* at 435-36. We believe that the word "another" should have led the court to that precise conclusion—that the single act of hijacking could be committed against multiple victims. But the court in *Pryor* reached the opposite conclusion, primarily based on the fact that the word "person" in the phrase at issue is defined as "an individual." *Id.* (citing 720 ILCS 5/2-15 (West 2002) (defining "person")). Reading the definitions of "person" and "another" together, the court in *Pryor* concluded that the vehicular hijacking statute only referred to a single individual as a victim. *Id.*

¶ 59    The court in *Pryor* reasoned that the word "another" in the statute refers to an individual separate and apart from the individual ("the person") from whom the car is taken. The court wrote:

> "Tamika [(one of the victims)] is the 'person' *** from whom the car was taken because it was her car and she was threatened. The car was also taken from the presence of 'another' and that was Marquis [(the other victim)]." *Id.* at 436.

¶ 60    While on one level we can appreciate the court's reasoning, its analysis cannot be squared with a plain reading of the statute. The language "from the person or immediate presence of another" does not refer to two separate people, "the person" and "another." The word "person" in the challenged language does not refer to an individual at all; the word "person" is used here in a different context, as part of a phrase. As discussed above, the only reference to victims in the statute is the word "another"—defined as one or more than one person—and the language preceding that word describes two different ways someone could be robbed of their car: having it taken from their "person" or from their "immediate presence."

¶ 61    The phrase "the person" or "the person of another" is by no means foreign to criminal statutes. Long ago and even at the common law, robbery referred only to a "taking from the person of another." See, *e.g.*, *People v. Braverman*, 340 Ill. 525, 530-31 (1930) (interpreting the phrase "taking from the person of another" in robbery statute). The current theft statute refers to the "[t]heft of property from the person." 720 ILCS 5/16-1 (West 2004); see *People v. Pierce*, 226 Ill. 2d 470, 473 (2007) (deciding "whether one commits the offense of theft 'from the person' in Illinois when he steals property that is not in physical contact with the person"). Battery has been defined as "the willful touching of the person of another." *People v. Grieco*, 44 Ill. 2d 407, 411 (1970).

¶ 62    Accordingly, we cannot agree with the court in *Pryor* that the language in the vehicular hijacking statute, referring to property taken "from the person or immediate presence of another," was intended to refer to two separate victims, "the person" and "another." The only reference to a victim in that statute is the word "another," which is expressly defined as including one *or more than one* victim.

¶ 63    We also respectfully disagree with *Pryor*'s reliance on three Illinois Supreme Court cases—*People v. Shum*, 117 Ill. 2d 317 (1987), *People v. Thomas*, 67 Ill. 2d 388 (1977), and *People v. Butler*, 64 Ill. 2d 485 (1976)—for the proposition that, whenever multiple victims are involved, multiple convictions must be entered. None of those cases involved a single taking of property in the presence of multiple victims.

¶ 64    In *Shum*, 117 Ill. 2d at 363, the court held that the defendant could stand convicted of both murder and feticide, where the defendant shot and killed a pregnant woman and her unborn

child. *Shum* is patently distinguishable, as murder and feticide are offenses that criminalize a particular type of harm to a person, not the taking of property from a person's presence. Because the offenses at issue in *Shum* criminalized harm—not a taking of property—it makes sense that multiple harms to different people should lead to multiple convictions.

¶ 65    And in *Thomas* and *Butler*, the defendants were convicted of multiple counts of robbery for taking multiple items from multiple victims. See *Thomas*, 67 Ill. 2d at 389 (defendants took money from five different people); *Butler*, 64 Ill. 2d at 487 (defendant and codefendant each took money from separate victims). Indeed, the supreme court in *Mack*, in finding that only one count of armed robbery could lie against the defendant for stealing the bank's money in the presence of two individuals, specifically distinguished both *Thomas* and *Butler* in this regard. See *Mack*, 105 Ill. 2d at 135 (distinguishing *Butler* and *Thomas* because "[i]n those cases there were multiple takings from multiple victims"). Consequently, none of the precedent relied on by the court in *Pryor* established that, when an offense criminalizes the taking of property, a defendant may be convicted of multiple offenses for a single taking.

¶ 66    The supreme court's decision in *Mack* lays to rest any notion that the taking of a single piece of property is anything but a single crime, regardless of how many victims are present during the taking. We respectfully disagree with the holding in *Pryor* and decline to follow it. But even if we agreed with it, to follow it would be to read the vehicular hijacking statute inconsistently with the supreme court's interpretation of a robbery statute that contains substantively identical language. We cannot prefer the holding of an appellate court over that of our supreme court.

¶ 67    We hold that a defendant may not be convicted of multiple counts of aggravated vehicular hijacking where he takes only one vehicle, even if multiple individuals are present. One of defendant's convictions for aggravated vehicular hijacking must be vacated.[3]

¶ 68    When multiple convictions violate the one-act, one-crime rule, we must vacate the less serious of the two convictions. *People v. Artis*, 232 Ill. 2d 156, 170 (2009). But "when it cannot be determined which of two or more convictions based on a single physical act is the more serious offense, the cause will be remanded to the trial court for that determination." *Id.* at 177. In order to determine whether one offense is more serious than another, we look to the possible punishments for the two offenses and which offense has the more culpable mental state. *Id.* at 170-71. Here, the two charges alleged the same offense against two different victims, which had the same mental states and carried the same penalties. We cannot determine which of the two is more serious and remand to the trial court for that determination.

¶ 69                    C. Firearm Sentence Enhancements

¶ 70    Defendant next contends, and the State agrees, that we should vacate his sentences for aggravated vehicular hijacking and attempted armed robbery because they include firearm-sentencing enhancements that were unconstitutional at the time of defendant's offenses. We note the court applied the 15-year sentencing enhancement to only one attempted armed robbery conviction (count 10).

---

    [3]While defendant did not object below to both convictions or include the issue in a posttrial motion, a violation of the one-act, one-crime doctrine amounts to plain error exempt from forfeiture. *Artis*, 232 Ill. 2d at 167-68. There is no procedural bar to vacating one of defendant's convictions.

- 11 -

¶ 71    Although defendant acknowledges that he failed to raise the issue at sentencing or in a motion to reconsider sentence, he argues we may address the issue as plain error. The State does not contest the error but asserts that we may reach the issue because the sentencing statute itself was facially unconstitutional. We agree with the State. See *People v. Thompson*, 2015 IL 118151, ¶ 32 ("A second type of voidness challenge that is exempt from forfeiture and may be raised at any time involves a challenge to a final judgment based on a facially unconstitutional statute that is void *ab initio*.").

¶ 72    At the time defendant committed his offenses, July 28, 2007, the firearm-sentencing enhancement for aggravated vehicular hijacking and armed robbery had been declared unconstitutional in *People v. Andrews*, 364 Ill. App. 3d 253, 275 (2006), and *People v. Hauschild*, 226 Ill. 2d 63, 86-87 (2007), respectively, as violating the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Subsequently, the General Assembly enacted curative legislation to the problems articulated in both cases. See Pub. Act 95-688 (eff. Oct. 23, 2007) (amending 720 ILCS 5/33A-2, 33A-3); *People v. Williams*, 2012 IL App (1st) 100126, ¶ 52. Thus, as of October 23, 2007, the constitutional infirmities in the statutes for aggravated vehicular hijacking and armed robbery disappeared. *Williams*, 2012 IL App (1st) 100126, ¶ 52.

¶ 73    But defendant's offenses occurred prior to the curative legislation, meaning that his enhanced sentences are unconstitutional. *People v. Taylor*, 2015 IL 117267, ¶ 17. Accordingly, we must remand the matter to the trial court for resentencing under the statutes as they existed prior to the adoption of the sentencing enhancement.[4] *Id.* ¶ 19.

¶ 74    Defendant also asks us to find that, as a matter of statutory construction, attempted armed robbery cannot be subject to the firearm-sentencing enhancement. But we have already held that the firearm enhancement should not apply to defendant's conviction because it was void at the time of his offense. This renders his argument regarding the applicability of the enhancement moot, and we will not issue an advisory opinion on its possible application in other scenarios. See *People v. Dunmore*, 2013 IL App (1st) 121170, ¶ 12. Here, the proper remedy for a defendant sentenced to enhanced sentences pursuant to a facially unconstitutional statute is remandment to the trial court for resentencing under the statutes as they existed prior to the adoption of the sentencing enhancement. *Taylor*, 2015 IL 117267, ¶ 19.

¶ 75                                    D. Mittimus

¶ 76    Defendant finally contends, and the State agrees, that his mittimus does not conform to the jury's verdicts. Defendant was convicted of six offenses: two counts of aggravated vehicular hijacking, two counts of attempted armed robbery, one count of unlawful use of a weapon by a felon, and one count of aggravated assault. His mittimus, however, reflects the following convictions: two counts of aggravated vehicular hijacking, one count of attempted armed robbery, and two counts of unlawful use of a weapon by a felon. Additionally, the mittimus reflects the two convictions for unlawful use of a weapon by a felon with sentences of five years in prison, despite the trial court orally pronouncing a sentence of seven years in prison for a single conviction for unlawful use of a weapon by a felon.

_____

[4]As noted above, because the trial court applied the 15-year sentencing enhancement to only one attempted armed robbery conviction (count 10), defendant shall only be resentenced on that attempted armed robbery count. His other attempted armed robbery count is not at issue.

¶ 77        When the mittimus does not correctly reflect the jury's verdicts and the court's oral pronouncement of the defendant's sentences, the proper remedy is to amend the mittimus to conform to the judgment and oral pronouncement. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶¶ 87-88; *Pryor*, 372 Ill. App. 3d at 438. As we have remanded the matter for resentencing and for a determination of which of defendant's two aggravated vehicular hijacking convictions is more serious, we direct the trial court to issue an accurate mittimus on resentencing.

¶ 78                                    III. CONCLUSION

¶ 79        For the reasons stated, we affirm defendant's convictions for aggravated vehicular hijacking, vacate one of his convictions for aggravated vehicular hijacking pursuant to the one-act, one-crime doctrine, remand for a determination of which of those convictions are less serious and should be vacated, and remand for resentencing and with instructions to issue an accurate mittimus.

¶ 80        Affirmed in part and vacated in part; remanded.